FILED
2021 Feb-08  PM 03:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **OZELLEOUS CONWELL,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| v. | } | **Case No.:  2:18-CV-2067-RDP** |
| | } | |
| **PLASTIPAK PACKAGING, INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Ozelleous Conwell is a former employee of Defendant Plastipak Packaging, Inc. This case is before the court on Defendant's Motion for Summary Judgment. (Doc. # 47). The Motion has been fully briefed and is ripe for decision. (Doc . # 48, 49, 50, 51. 54). The question presented here is whether Conwell has presented sufficient evidence to go to a jury on his claims that Plastipak interfered with his rights under the Family and Medical Leave Act and that Plastipak retaliated against him for exercising his rights under that statute. For the reasons discussed below, the Motion is due to be granted in part and denied in part.

## I.    Background[1]

Plastipak produces plastic bottles at a plant in McCalla, Alabama. (Doc. # 48-1 ¶4). The facility operates twenty-four hours per day, with employees working pre-set shift schedules. (Doc. # 48-1 ¶4). Conwell was scheduled to work on the overnight shift. (Doc. # 48-2 at 96, 144; Doc. #

---

[1] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

48-1 ¶4, Ex. A, pp. 13-14).[2] Conwell's shifts were 11.7 hours long (after deducting a lunch break). (Doc. # 48-1 ¶15).

Conwell first worked at Plastipak through a temp agency in 2014, but had attendance issues (due to owing overdue child support leading to jail time) which ended his prior employment. (Doc. # 48-2 at 23-24). Plastipak re-hired Conwell as a full-time employee on August 3, 2015. (Doc. # 48-1 ¶5; Doc. # 48-2 at 29-30). Conwell worked as a forklift operator, a position he held throughout his employment. (*Id.*). Jay Johnson was initially the Team Lead on Conwell's shift, but Roderick Foy assumed that role in August 2016.  (Doc. # 48-5 at 26-27; Doc. # 48-6 at 18-19).

Raquel Melton is the Talent Management Manager at Plastipak. (Doc. # 48-1 ¶2). Shelly Wallace was a human resources generalist in the Talent Management department and she reported to Melton. (Doc. # 48-7 at 18-19). The Talent Management department at Plastipak's McCalla, Alabama location consisted of those two: Melton and Wallace. (Doc. # 48-5 at 66). The Talent Management department works during the day shift. (Doc. # 48-1 ¶2).

Plastipak has a written attendance policy, which Conwell received when he was hired. (Doc. # 48-1 ¶6; Doc. # 48-2, Ex. 3). The Attendance and Tardiness Policy states that "[i]t is the employee's responsibility to call in to their manager and/or shift lead when absent or tardy." (Doc. # 48-2, Ex. 5). When he was hired, Conwell signed four forms related to attendance and call-in procedures. (Doc. # 48-2, Exs. 3-6). The Attendance and Tardiness Acknowledgement states that the "Call-In Policy" is that "Associates must call the shift lead, department manager or Talent Management/Human Resources as soon as possible but definitely no later than the Associate's

---

[2] Due to the manner in which Defendant's evidentiary submission was filed in this case -- depositions and related exhibits were filed within one CM/ECF document -- there may be two citations to the same CM/ECF document following each other. Citations to depositions are made to the deposition page number. Citations to exhibits are made either to the exhibit number or to the specific CM/ECF page number of the relevant exhibit. Counsel are advised to file any future evidentiary submissions in a more user-friendly manner. Additionally, it is helpful for the court's courtesy copy to have been printed from CM/ECF, such that it contains the CM/ECF page numbers.

shift's starting time." (Doc. # 48-2, Ex. 3). The Call-In Procedure form in turn indicates that "[i]t is extremely important that you call your shift lead, manager, or Talent Management department as soon as possible, but definitely no later than your starting time." (Doc. # 48-2, Ex. 4).

Work absences and tardies are subject to progressive discipline and eventual termination. (Doc. # 48-1 ¶8[3]; Doc. # 48-2, Ex. 11, pp. 221-222). The Attendance and Tardiness Agreement provides that "[e]xcessive absenteeism is defined as three or more days absent in a six (6) month period." (Doc. # 48-2, Ex. 6). And "[e]xcessive tardiness is defined as three (3) or more times or an accumulation of four (4) or more hours of tardiness or early departures in a one (1) month period." (*Id.*). The steps are "First Notice – Written interview, Second Notice – Written Interview (Final Notice), Third Notice – Subject to Discharge." (*Id.*).

Work absences are not subject to the attendance policy if the employee is absent while on FMLA leave. (Doc. # 48-1 ¶8). Plastipak's handbook prohibits any actions that would "interfere with, restrain, or deny the exercise of any right provided under the FMLA" as well as "discharg[ing] or discriminat[ing] against any person for the following: opposing any practice made unlawful by the FMLA; or involvement in any proceeding relating to the FMLA." (Doc. # 48-5 at 83; Doc. # 48-5, Ex. 3). Plastipak's Leave Policy provides that "All requests for LOAs must be communicated and documented through your local Talent Management Department. You can make LOA requests in the following ways: in person, in writing, via telephone, via e-mail, through an individual representing you (in the event that you are unable to make the request on your own behalf), or by another means mutually agreed upon by the associate and Talent Management Representative." (Doc. # 48-3, Ex. 11, DEF-62).

---

[3] The court notes that the affidavit of Raquel Melton which was filed with the court (Doc. # 48-1) is the "Second Affidavit of Raquel Melton." It is a different version than the courtesy copy provided by Defendant to the court which is simply the "Affidavit of Raquel Melton."

After his re-hiring, Conwell continued to have non-health related attendance and tardiness issues. (Doc. # 48-2 at 64; Doc. # 48-1 ¶9).  In December 2015, Conwell received a warning for excessive tardies, including three tardies in the same month. (Doc. # 48-1 ¶9, Ex. B, p. 16). In January 2016, Conwell received a written warning for three absences. (Doc. # 48-1 ¶9, Ex. B, p. 17). By April 2016, Conwell received an additional warning for excessive tardies, including four tardies in the same month. (Doc. # 48-1 ¶10, Ex. C, p. 19).

On May 18, 2016, a Second Notice - Written Interview (Final Warning) was prepared for Conwell because he was "tardy and/or left early" on February 10, March 18, May 13, and May 14, 2016. (Doc. # 48-1 ¶10, Ex. C, p. 20). The Final Warning noted that "[a]nother absence may result in termination of your employment. Please note, all Final Warnings are in effect for twelve months." (Doc. # 48-1 ¶10, Ex. C, p. 20).

Plastipak provides Short-Term Disability (STD) insurance which runs concurrently with FMLA when employees are eligible for both. (Doc. # 48-1 ¶¶10, 13). In June and July 2016, Conwell was admitted to Bradford Health Services for treatment. He was not yet FMLA-eligible, but received STD insurance benefits and was placed on a medical leave of absence (LOA) to protect his employment. (Doc. # 48-1 ¶¶11-12).

Upon his return to work from LOA, Conwell acknowledged receipt of the Final Warning for the February, March, and May absences. (Doc. # 48-1 ¶10, Ex. C, p. 20). In August 2016, after having received the Final Warning from May 2016, which he acknowledged in late July 2016, Conwell incurred three additional tardies on August 5 (son's birthday); August 6 (rain); and August 19, 2016 (taking child somewhere). (Doc. # 48-1 ¶14, Ex. D, pp. 22-24).

Conwell became FMLA eligible August 3, 2016. (Doc. # 48-1 ¶15). Plastipak tracks individual employee FMLA usage using a spreadsheet the company refers to as its FMLA Tracker.

4

(Doc. # 48-1 ¶19, Ex. E, pp. 27-28). Plastipak accounts for FMLA leave usage on an hourly basis, meaning an employee is entitled to 480 hours of annual FMLA leave. (Doc. # 48-1 ¶14). On August 1, 2016, Plastipak changed its method of tracking FMLA leave to a rolling twelve month period measure backward from the date the employee uses the leave. (Doc. # 48-1 ¶17). However, according to Melton, she calculated Conwell's leave under both methods to see which benefitted him most. (Doc. # 48-1 ¶17).

On August 30, 2016, Conwell was hospitalized for diabetes and associated kidney disease. (Doc. # 48-2 at 78-80). On September 2, 2016, Conwell notified Plastipak he needed leave for his diabetes beginning August 30. (Doc. # 48-2 at 82-85, Exs. 14-15, pp. 243-245). He was provided FMLA paperwork, and signed acknowledging its receipt. (*Id.*). The acknowledgement states that Conwell "acknowledge[s] that the FMLA request is not valid until it has been reviewed, certified, and approved by Talent Management and that FMLA documentation including the WH-380E or WH-380F must be completed and returned to the Talent Management department no later than 15 calendar days from the date of request." (Doc. # 48-3, Ex. 15). Diabetes with associated kidney disease is the only serious health condition for which Conwell sought FMLA leave throughout Fall 2016 and January 2017, although he also had some issue with swelling in his legs which was related to his diabetes. (Doc. # 48-2 at 46-47). Plastipak did not receive a completed medical certification within 15 days of providing the paperwork, so it extended the deadlines without any negative effect on Conwell's continued absences. (Doc. # 48-1 ¶22).

Conwell was absent from work shifts on August 30 as well as September 2, 3 and 4, 2016 due to diabetes and he provided a doctor's note for those dates. (Doc. # 48-1 ¶21, Ex. G, p. 34; Doc. # 48-3, Ex. 16). Conwell was also absent from work shifts on September 7 and 8 and was evaluated at the UAB West emergency room on September 8. (Doc. # 48-1 ¶21; Doc. # 48-2 at 89,

Ex. 17, p. 247). Plastipak designated Conwell's work absences from six shifts during the period August 30 through September 12 as FMLA leave. (Doc. # 48-1 ¶21, Ex. E, p. 27; Doc. # 48-2 at 103).

On September 22, 2016, Conwell reported to work as scheduled, but left within an hour "complaining of tiredness and acting lethargic." (Doc. # 48-1 ¶24; Doc. # 48-2 at 103-105). Conwell thought his insulin may have been low and stated that he was going to the emergency room. (Doc. # 48-1 ¶24; Doc. # 48-2 at 103-105; Doc. # 48-3, Ex. 21). Conwell required hospitalization for his diabetes on September 26 and 27. (Doc. # 48-2 at 107; Doc. # 48-1, Ex. I, p. 39). Conwell also sought treatment at the Brookwood Baptist emergency department for diabetes on October 1 and supplied Defendant with a doctor's note excusing him from work until October 3. (Doc. # 48-1 ¶25, Ex. I, p. 40; Doc. # 48-4, Ex. 25). During this period, Conwell missed scheduled work shifts on September 26, 27 and 30, and October 1 and 2. (Doc. # 48-1 ¶25). Plastipak designated these absences FMLA leave due to Conwell's diabetes. (Doc. # 48-1, Ex. E, pp. 27-28).

On October 6, 2016, Conwell missed work due a diabetic flare-up and provided a note from Dr. Willie Askew for his absence. (Doc. # 48-1 ¶27, Ex. K, p. 47; Doc. # 48-2 at 115). Dr. Askew noted that Conwell could return to work on October 10, 2016. (Doc. # 48-4, Ex. 26). Plastipak designated the October 6 absence as FMLA leave. (Doc. # 48-1 ¶27).

On October 18, 2016, Conwell called Melton and informed her he was at the hospital again. (Doc. # 48-7 at 78, Ex. 10). On October 20, 2016, Melton called Conwell to tell him she needed paperwork excusing his absences from October 11 through October 20, 2016. (Doc. # 48-7 at 78-79, Ex. 10).

On October 21, 2016, Conwell provided Plastipak an excuse from Dr. Askew dated October 11, 2016 stating that Conwell was under his care and that he should be excused from work for thirteen (13) days and that he could return to work on October 24, 2016. (Doc. # 48-4, Exs. 28, 29; Doc. # 48-7 at 79, Ex. 10). Dr. Askew noted the absences from October 11 through October 24 were due to Conwell's diabetes/kidney condition. (Doc. # 48-2 at 117-118; Doc. # 48-4, Ex. 28, p. 282). Conwell suffered fluid build-up from diabetes which was causing abscesses. (Doc. # 48-2 at 117-118).

Conwell did not return to work on October 24, 2016. (Doc. # 48-4. Ex. 29). On October 24, 2016, Conwell called Melton from the hospital to inform her he was scheduled for surgery the next day. (Doc. # 48-7 at 79, Ex. 10). Melton told Conwell she still needed clarification concerning dates of incapacity on his WH-380 forms. (*Id*.). Conwell was hospitalized from October 21 until October 27, 2016. (Doc. # 48-2 at 127; Doc. # 48-4, Ex. 30). On or about November 5, 2016, Dr. Gardner signed a note indicating that Conwell had been under his care since October 24, 2016, and would be released to return to work on November 9, 2016. (Doc. # 48-2 at 137; Doc. # 48-4, Ex. 31, p. 296; Doc. # 48-7 at 81-82, Ex. 10).

In October and November 2016, Conwell missed fifteen (15) scheduled shifts: October 11, 14, 15, 16, 19, 20, 24, 25, 28, 29 and 30, and November 2, 3, 7 and 8. (Doc. # 48-1 ¶28). Plastipak designated the 15 missed shifts as FMLA leave because Conwell submitted information indicating that they were due to his diabetes. (Doc. # 48-1 ¶28).

On November 12 and 13, 2016 Conwell missed scheduled shifts due to what he thought might be food poisoning. (Doc. # 48-1 ¶30). However, Conwell provided a WH-380E signed by Dr. Askew indicating that Conwell had been incapacitated due to uncontrolled diabetes on both November 12 and 13, 2016. (Doc. # 48-4, Ex. 30, p. 285).

On November 17, Conwell initially texted his supervisor that he would be late, but later called to report that his son was sick, and he missed the entire shift. (Doc. # 48-1 ¶30). Conwell provided a WH-380E signed by Dr. Askew indicating that Conwell had been incapacitated due to uncontrolled diabetes on November 17, 2016. (Doc. # 48-4, Ex. 30, p. 285).

On November 25, 2016, Conwell missed his shift because he had to bail his son out of jail and retrieve his car. (Doc. # 48-1 ¶30). Plastipak counted this absence as FMLA leave. (Doc. # 48-1 ¶31, Ex. P, p. 67; Doc. # 48-2, Ex. 19). By designating the November 12, 13, 17 and 25 absences as FMLA leave, Plastipak did not count against Conwell any absences on those dates as occurrences under the attendance policy. These absences occurred within one year of Conwell receiving the May 2016 Final Warning for attendance. (Doc. # 48-1 ¶31).

In December 2016, Dr. Askew took Conwell off work for the period December 1 through December 19 due to his diabetes. (Doc. # 48-2 at 150; Doc. # 48-1 ¶32, Ex. R, p. 75; Doc. # 48-4, Ex. 33). During this time period, Conwell missed another eight scheduled work shifts on December 1, 5, 6, 9, 10, 11, 14, and 15, which Plastipak designated FMLA leave. (Doc. # 48-1 ¶32, Ex. E, pp. 27-28). On December 9, 2016, Conwell informed Plastipak that Dr. Askew was now the physician treating his diabetes. (Doc. # 48-1 ¶33). Plastipak issued a third set of FMLA paperwork with a medical certification to be completed by Dr. Askew. (Doc. # 48-1 ¶33).

On January 5, 2017, Dr. Askew completed and signed a certification confirming that Conwell's absences for November 12, 13, 17, and December 6 through 15, 2016 were related to his diabetes. (Doc. # 48-1 ¶34, Ex. P, pp. 65-68). Because Dr. Askew did not complete the portion of the certification specifying information about the frequency and duration of expected future diabetic flare-ups, Plastipak requested clarification several times in January. (Doc. # 48-1 ¶35; Doc. # 48-4, Ex. 30 at p. 295).

8

None of Conwell's absences between August 30 and December 31, 2016 counted against him under the company attendance policy. (Doc. # 48-2 at 152-153). Conwell did not recall Plastipak refusing to provide any paperwork or holding any absences during this period against him. (Doc. # 48-2 at 153-54).

On January 11, 2017, Conwell called-in to his supervisor to report he would be absent due to a family emergency. (Doc. # 48-1 ¶36, Ex. T, p. 79). With this absence, Conwell had exceeded four occurrences under the attendance policy within a rolling twelve month period. (Doc. # 48-1 ¶36, Ex. U, p. 80). None of his FMLA absences counted toward that total of four. (*Id.*: Doc. # 48-3, Ex. 19).

On January 16, 2017, Conwell reported to his shift, but after midnight (so, technically on January 17) he was involved in two separate forklift accidents in which he damaged inventory. (Doc. # 48-1 ¶37).

During the day on January 17, Melton issued Conwell a Step 1 - Verbal Warning over the phone because he had exceeded four occurrences under the attendance policy within a rolling 12-month period. (Doc. # 48-1 ¶36, Ex. U, p. 80; Doc. # 40-2 at 188).

On the evening of January 17, 2017, Conwell missed his shift. He told his supervisor he was tired from running errands all day. (Doc. # 48-1 ¶38).

On January 20, 2017, when Melton learned of the forklift accidents that occurred in the early hours of January 17, 2017, she prepared a Communication to Conwell. (Doc. # 48-1 ¶37, Ex. V, p. 83). The January 20 Communication also noted a "near miss" that had been reported on November 23, 2016. (Doc. # 40-2 at 189). Conwell did not appear for work on January 20, 2017; he called his supervisor to inform him he would be late, but he never came to work and never called back. (Doc. # 48-1 ¶38, Ex. W, p. 86).

Conwell called-in to his supervisor to say that he was sick due to diabetes on January 21, 22, 25 and 26, 2017. (Doc. # 48-1 ¶39, Ex. X, pp. 90-93). On January 25, Melton spoke with Conwell about FMLA paperwork. (Doc. # 47-7 at 87).  Also on January 25, Conwell called after his shift had started to say he would not be in because he had to go to the doctor the next day. (Doc. # 48-4, Ex. 37). The four absences were each designated FMLA leave. (Doc. # 48-1 ¶39, Ex. E, pp. 27-28).

On January 23, 2017, when she learned he did not call his supervisor the evening of January 20 to let him know he would be absent, Melton issued Conwell a Written Communication. (Doc. # 48-1 ¶39, Ex. W). Although Melton prepared Communications regarding Conwell's failure to follow proper call-in procedures, and regarding the January 17 and 20, 2017 absences, the absences were not counted against him under the attendance policy. (Doc. # 48-5 at 213-214, Ex. 21).

On January 30, 2017, Conwell called Melton from his doctor's office about FMLA paperwork. Melton spoke directly with an employee at the doctor's office about the paperwork. (Doc. # 48-7 at 88-89). Conwell  provided a note from Dr. Askew dated January 30, 2017, which excused him from work from January 18 through January 30, 2017. (Doc. # 48-5 at 213-214, Ex. 21). Dr. Askew noted that Conwell could return to work on January 31, 2017. (*Id.*).

Also on January 30, Wallace emailed Benefits Coordinator, Randi Ihrke and Melton stating that it appeared Conwell had used a little more than twelve weeks of FMLA leave and asked for verification. (Doc. # 48-7 at 68-71, Ex. 9). Ihrke responded, "Do you measure using the first day forward or the look back method?" to which Wallace replied, "Measured forward." (Doc. # 48-7 at 68-71, Ex. 9). That same day, Plastipak prepared and mailed to Conwell a Form WH-382 stating that his FMLA leave request was not approved and that he had exhausted his FMLA leave entitlement in the applicable 12-month period. (Doc. # 48-1 ¶41, Ex. Y, p. 95). Conwell exhausted

his 480 hours of FMLA leave during the week of January 22, 2017. (Doc. # 48-3, Ex. 19). That is, between August 2016 and January 30, 2017, Conwell used more than 480 hours of FMLA leave. (*Id.*).

After speaking with Melton on January 30, Conwell did not show up for work and did not call his supervisor. (Doc. # 48-1 ¶ 42). On January 31, Melton issued another Written Communication again counseling Conwell for failing to follow the proper call-in procedures the prior evening. (Doc. # 48-1 ¶42, Ex. Z, p. 97). This January 31, 2017 Communication served as a Final Warning. (*Id.*). The Communication stated that "[a]ny violation of the Work Rules during the twelve (12) months from the date this is issued may result in termination." (*Id.*). The Communication noted that Conwell did not follow proper call-in procedures, but it did not indicate what those procedures were or what portion of the policy, in particular, he failed to follow. (Doc. # 48-1, Ex. Z).

When Conwell returned to work the night of January 31, his supervisor, Rod Foy, provided him copies of the recently issued Communications. (Doc. # 48-1 ¶44).

In its FMLA Tracker, Plastipak (at least initially) incorrectly calculated Conwell's FMLA absences as 12.25 hours per day based on a full shift. (Doc. # 48-5 at 273-77). Under that method, Conwell would have exhausted his FMLA leave during the week of December 11, 2016. (*Id.*). When Melton, Wallace, and Ihrke became aware of the error, they re-calculated Conwell's FMLA usage using the correct 11.7 hours per shift. (*Id.*). Using the correct method allocating 11.7 hours per shift, Conwell exhausted his 480 hours of FMLA leave in January 2017. (*Id.*).

On January 31, 2017, Conwell worked his night shift and saw Melton when she came to work on the next morning, February 1, 2017. (Doc. # 48-5 at 189-190). Melton informed Conwell

that he had exhausted his FMLA leave, provided him additional STD paperwork, and encouraged him to call the insurer about a short-term disability claim. (Doc. # 48-1 ¶44).

Conwell missed scheduled shifts on February 3, 4, and 5, 2017. In each instance, he notified his supervisor directly that he would not be at work. (Doc. # 48-1 ¶45).

On February 8, 2017, Conwell spoke with Wallace and informed her that he had been at the hospital all day, would miss his February 8 shift, would not be back to work until February 9, and would bring doctor's notes to cover the February 3, 4, and 5 absences. (Doc. # 48-7 at 94-95, Ex. 10, p. 13-14). Conwell did not call in to his supervisor to let him know he would not be at work that night. (Doc. # 48-1 ¶46; Doc. # 48-2 at 211-212). Conwell thought that speaking with Wallace would suffice for a call-in reporting his absence: "Once I told her that it was supposed to went over to the warehouse." (Doc. # 48-2 at 209).[4] Wallace's note in Conwell's LOA Log for February 8 does not indicate that she told Conwell to call his supervisor. (Doc. # 40-5 at 105).

After Conwell missed his February 8 shift, Conwell's supervisors e-mailed Wallace and asked about his absence. (Doc. # 40-5 at 158). Despite the fact that Wallace had talked to Conwell while he was at the hospital that day, and despite the fact that Conwell had told her he would not be at work, Wallace instructed Conwell's supervisors to "[j]ust mark no call no show." (*Id.*).

On February 9, 2017, Conwell again spoke with Wallace and informed her that he would not be in for his shift that night. (Doc. # 48-7, Ex. 10 p. 14). Conwell did not call his supervisor to inform him he would miss the February 9 shift. (Doc. # 48-1 ¶¶47-48). Conwell does not recall whether Wallace told him he must call his supervisor. (Doc. # 48-2 at 208-209). Wallace's notes in Conwell's LOA Log for February 9 indicate that she told Conwell that he should call his

---

[4] The court notes that Talent Management employees apparently are in the office during core business hours whereas Conwell worked on the overnight shift.

supervisor to let him know he would not be in, and that he said he would do so. (Doc. # 40-5 at 106; Doc. # 48-7, Ex. 10).

On February 10, 2017, a Termination Notice was drafted and given to Conwell for not following the proper call-in procedure on February 8 and 9, 2017 after multiple warnings. (Doc. # 48-5 at 212-213; Doc. # 48-5, Ex. 27; Doc. # 48-1 ¶47).

Also on February 10, 2017, Conwell presented a doctor's note for his absences on February 3 through 5, stating that he had an allergic reaction and could return to work on February 8, 2017. (Doc. # 48-7, Ex. 27). Conwell also provided a doctor's note for his absence on February 9 which stated he had been seen in the office at Ortho Sports Associates on February 9 for left shoulder and neck pain, and that he could return to work on February 13, 2017. (Doc. # 48-7, Ex. 28; Doc. # 48-4, Ex. 57). That note also purported to excuse Conwell's absence on February 8. (Doc. # 48-7, Ex. 28; Doc. # 48-4, Ex. 58).

## II.   Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1381 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.    Analysis

"The FMLA grants eligible employees a series of entitlements, among them the right to 'a total of 12 workweeks of leave during any 12–month period' for a number of reasons, including 'a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1267 (11th Cir. 2017) (citing 29 U.S.C. § 2612(a)(1)(D)). "To preserve and enforce these rights, 'the FMLA creates two types of claims: [1] interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act . . . and [2] retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act.'" *Jones*, 854 F.3d at 1267 (quoting *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001)) (internal citations omitted).

In his Complaint, Conwell asserted two claims against Plastipak under the FMLA. Count One is an Interference claim; Count Two is a retaliation claim. (Doc. # 1). The court addresses Conwell's interference claim before turning to his retaliation claim.

A.    **FMLA Interference**

An interference claim occurs when an employer interferes with, restrains, or denies the exercise or attempted exercise of FMLA rights or benefits. 29 U.S.C. § 2615(a)(1). To state a claim for FMLA interference, a plaintiff must establish that he was entitled to a benefit under the FMLA and that the defendant denied him that benefit. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006); *see also Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1235 (11th Cir. 2010); *Strickland*, 239 F.3d at 1206-07. The employee need not allege that his employer intended to deny the benefit, because "the employer's motives are irrelevant." *Strickland*, 293 F.3d at 1208.

Conwell presents four arguments as to why Plastipak interfered with his rights under the FMLA: he argues (1) Plastipak counted non-FMLA qualifying leave as FMLA leave; (2) Plastipak changed its method of counting FMLA leave without proper notification; (3) Conwell received discipline while he was on FMLA leave; and (4) Plastipak called him several times while on FMLA leave. (Doc. # 51 at 29-33). Each of these arguments fails to create a material issue of fact.

Conwell argues that leave he took on November 12, 13, 17, and 25, 2016 was not FMLA qualifying and that the 11.7 hours of FMLA leave for each of these days should not have been charged against his available FMLA leave. He asserts that he had food poisoning on November 12 and 13. He states that he was absent because his son was sick on November 17. However, while all that may be so, Conwell provided a WH-380E to Plastipak signed by Dr. Askew indicating that Conwell had been incapacitated due to uncontrolled diabetes on November 12, 13 and 17, 2016. (Conwell Dep. Ex. 30 at p. 285).

"[A]n employer is entitled to rely on a 'negative certification' in denying FMLA leave." *Nawrocki v. United Methodist Ret. Communities, Inc*., 174 F.App'x 334, 338 (6th Cir. 2006) (citing *Stoops v. One Call Communications, Inc*., 141 F.3d 309 (7th Cir. 1998)). If an employer is entitled to rely on a medical certification in denying FMLA leave, it is also entitled to rely on a medical certification in designating leave as FMLA qualifying. *See Novak v. MetroHealth Med. Ctr*., 503 F.3d 572, 578 (6th Cir. 2007) ("A medical certification is presumptively valid if it contains the required information and is signed by the health care provider"). "The FMLA (29 U.S.C. § 2613) and its applicable Regulation (29 C.F.R. § 825.307(a)) 'establish that the medical certification provided by the employee is presumptively valid if it contains the required information and is signed by the health care provider.'" *Wilkinson v. Greater Dayton Reg'l Transit Auth*., 2012 WL 5879782, at *3 (S.D. Ohio Nov. 21, 2012), report and recommendation adopted, 2012 WL 6184945 (S.D. Ohio Dec. 11, 2012) (citing *Harcourt v. Cincinnati Bell Tel. Co*., 383 F. Supp. 2d 944, 955-56 (S.D. Ohio 2005) and *Novak*, 503 F.3d at 578).

On November 25, 2016, Conwell sent two text messages to his supervisor, Jay Johnson. (Doc. # 48-1 ¶10, Ex. O). At 6:11 p.m., Conwell stated "running late about an hour." (*Id.*). At 9:49 p.m. Conwell texted Johnson again and stated "sick can't make it." (*Id.*). Plastipak accepted Conwell's stated reason for his absence without question (or interference) and designated that leave as FMLA qualifying.

Even if Plastipak should not have counted November 25, 2016 as FMLA leave, Conwell was not damaged. First, November 25, 2016 was only about six months after May 18, 2016, when Conwell received a Final Warning for attendance which noted that "[a]nother absence may result in termination of your employment. Please note, all Final Warnings are in effect for twelve months." (Doc. # 48-1 ¶10, Ex. C, p. 20). Thus, to the extend Plastipak erred by designating

17

Conwell's November 25, 2016 leave as FMLA qualifying based on his report that he was absent because he was sick, it did so to his benefit so that he would not be terminated for incurring another absence. Second, according to Plastipak's corrected FMLA tracker, Conwell used 33.8 hours more FMLA leave than he was entitled to take. Therefore, even if the November 25 absence is not counted against Conwell's FLMA leave allotment, Conwell still used more FMLA leave than he was allotted. These facts simply do not support an interference claim because Conwell was not denied a benefit to which he was entitled under the FMLA. *See Hurlbert*, 439 F.3d at 1293; *Krutzig*, 602 F.3d at 1235; *Strickland*, 239 F.3d at 1206-07.

As to Plastipak changing its method of counting FMLA leave, because the record shows that Conwell received every FMLA benefit to which he was entitled, Plastipak is entitled to summary judgment on Conwell's interference claim. "[A] plaintiff suffers no FMLA injury when [he] receives all the leave [he] requests. . . ." *Graham v. State Farm Mut. Ins. Co*., 193 F.3d 1274, 1275 (11th Cir. 1999); *see also Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1268 (11th Cir. 2017) ("Relevant caselaw suggests that an employer does not interfere with an employee's right to reinstatement if that employee is terminated after taking leave in excess of the 12 weeks permitted by the FMLA."); *Giles v. Daytona State Coll., Inc*., 542 F.App'x. 869, 874-75 (11th Cir. 2013) (where the record confirmed that the plaintiff used all of her available FMLA leave, there was no evidence that she was denied an FMLA benefit to which she was entitled, thus the court affirmed entry of summary judgment to the employer on an FMLA interference claim); *Odum v. Dolgencorp, LLC*, 2015 WL 12697644, at *2 (N.D. Ga. Sept. 9, 2015) (adopting Magistrate Judge's recommendation and finding that "Plaintiff has no interference claim because he received all of the FMLA benefits (i.e., twelve weeks of leave) to which he was entitled.") (internal quotations omitted).

Nor can Conwell establish that he suffered any harm as a result of receiving telephone calls while on FMLA leave. *See e.g.*, *Simmons v. Indian Rivers Mental Health Ctr.*, 652 F.App'x. 809, 818-19 (11th Cir. 2016) (concluding the district court did not err in finding occasional and brief telephone calls of a limited nature did not interfere with the employee's FMLA leave where the employee was not required to perform work during her FMLA leave, she received all the leave that she was due, and she suffered no consequences for refusing to take or respond to occasional telephone calls while she was on leave). Like the plaintiff in *Simmons*, Conwell was not required to perform work during his leave, he received all (indeed, even more) of the leave to which he was entitled, and he was restored to his position after taking the leave. Therefore, he cannot establish that he suffered any injury as a result of being called while on FMLA leave. *Simmons*, 652 F.App'x. at 1322; *see also Turner v. Alabama & Gulf Coast Ry. LLC*, 286 F. Supp. 3d 1312, 1322 (S.D. Ala. 2017).

Finally, Conwell argues that Plastipak interfered with the exercise of his FMLA rights because he received discipline while on FMLA leave. However, the FMLA does not preclude an employer from taking disciplinary action it would have taken had the employee never been placed on leave in the first place. That is, it does not grant an employee immunity from discipline. *See Laing*, *v. Fed. Exp. Corp.*, 703 F.3d 713, 723-24 (4th Cir. 2013) ("[T]he FMLA does not preclude an employer from [disciplining an employee] upon her return from [FMLA] leave if it would have taken the same action had the employee never taken leave in the first place."); *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 549-50 (4th Cir. 2006) (granting summary judgment for defendant on FMLA interference claim when it fired an employee on FMLA leave during a company reorganization); *see also Hanning v. St. Joseph's Ministries, Inc.*, 2015 WL 9304538, at *5 (D. Md. 2015).

In the early hours on January 17, 2017, Conwell had two separate forklift accidents in which he damaged inventory. (Doc. # 48-1 ¶37, p. 9). Writing Conwell up for this incident and attendance issues unrelated to his FMLA leave in no way prohibited him from fully exercising his rights under the FMLA. Even discipline for failing to follow the employer's procedures for requesting FMLA leave (which is not what occurred here) does not necessarily constitute FMLA interference. *See Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 789 (5th Cir. 2017) ("An employer may thus require that an employee hew to the employer's usual and customary procedures for requesting FMLA leave. Discipline resulting from the employee's failure to do so does not constitute interference with the exercise of FMLA rights unless the employee can show unusual circumstances."); *see also Bacon v. Hennepin Cty. Med. Ctr.*, 550 F.3d 711, 715 (8th Cir. 2008) ("Employers who enforce [call-in] policies by firing employees on FMLA leave for noncompliance do not violate the FMLA."); *Throneberry v. McGehee Desha Cty. Hosp.*, 403 F.3d 972, 980 (8th Cir. 2005) (an employer may discipline an employee for misconduct associated with FMLA leave if it would have imposed the same discipline if the employee had taken a different form of leave).

Because Conwell was able to use all of his available FMLA leave (and more), and there was no evidence that he was denied an FMLA benefit to which he was entitled, Plastipak is entitled to summary judgment on his FMLA interference claim. *Giles*, 542 F.App'x. at 874-75.

### B.    FMLA Retaliation

"[T]o succeed on a retaliation claim, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." *Strickland*, 239 F.3d at 1207. "When a plaintiff asserts a claim of retaliation under the FMLA, in the absence of direct evidence of the employer's intent, we apply

the same burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for evaluating Title VII discrimination claims." *Strickland*, 239 F.3d at 1207 (citing *Brungart v. BellSouth Telecomm. Inc*., 231 F.3d 791, 798 (11th Cir. 2000)).

A plaintiff may establish a prima facia case of FMLA retaliation by using a modified version of the *McDonnell Douglas* standard that applies to Title VII retaliation cases. Under this model, a FMLA plaintiff must show that: "(1) [he] engaged in statutorily protected activity, (2) [he] suffered an adverse employment decision, and (3) the decision was causally related to the protected activity." *Jones*, 854 F.3d at 1271 (internal quotation marks and citations omitted); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). If the plaintiff successfully establishes his prima facia case, the burden shifts to the defendant to articulate "a legitimate, nondiscriminatory reason" for the adverse employment action, "which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal citations and quotation marks omitted). If the defendant satisfies that burden, then the burden shifts back to the plaintiff to prove that the defendant's stated reason is merely a pretext for the retaliatory conduct. (*Id.*). Despite this shifting of the burden of production between the plaintiff and the defendant under the *McDonnell Douglas* framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally [retaliated] against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

### 1.   Prima Facie Case

Here, there is no dispute that Conwell engaged in protected conduct under the FMLA. He regularly took FMLA leave during 2016 and 2017. Nor is there any dispute that he suffered an

adverse employment action. Plastipak terminated his employment on February 10, 2017. Plastipak disputes, however, whether Conwell can show that his termination was causally related to his use of FMLA leave. (Doc. # 49 at 27).

"The causal connection element is satisfied if a plaintiff shows that the protected activity and adverse action were 'not wholly unrelated.'" *Krutzig*, 602 F.3d at 1234 (quoting *Brungart*, 231 F.3d at 799). A plaintiff can meet this burden by showing "that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Id*. "Close temporal proximity between protected conduct and an adverse employment action is generally 'sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.'" *Hurlbert*, 439 F.3d at 1298 (quoting *Brungart*, 231 F.3d at 799); *see also Jones*, 854 F.3d at 1271. "[T]emporal proximity, for the purpose of establishing the causation prong of a prima facie case of FMLA retaliation, should be measured from the last day of an employee's FMLA leave until the adverse employment action at issue occurs." *Jones*, 854 F.3d at 1272.

Although the timing between Conwell's last use of FMLA leave in mid-to-late January and his termination on February 10 is close, Plastipak asserts that Conwell's intervening acts of misconduct broke any causal chain. The Eleventh Circuit has held that no causal connection exists when intervening misconduct caused the adverse employment action. *See Fleming v. Boeing*, 120 F.3d 242, 248 (11th Cir. 1997) (indicating that no causal connection existed based on failure to hire where the applicant failed an essential employment test). However, here, there is some dispute regarding the intervening acts. Because of this ambiguity (which will be discussed in further detail below), in light of the very close temporal proximity, the court finds that Plaintiff has presented sufficient evidence to establish that his FMLA leave and his termination were "not wholly unrelated." *Krutzig*, 602 F.3d at 1234.

### 2.   Defendant's Articulated Reasons

The next question is whether Plastipak has articulated a legitimate reason for Conwell's termination and whether Plaintiff can show that reason is a pretext for retaliation. "If the employee successfully demonstrates a prima facie case of FMLA retaliation, the burden then shifts to the employer to articulate a legitimate reason for the adverse action." *Brisk v. Shoreline Found., Inc*., 654 F.App'x 415, 417 (11th Cir. 2016) (citing *Strickland*, 239 F.3d at 1207). "An employer's reason for an employment decision can be 'a good reason, a bad reason, a reason based on erroneous facts, or ... no reason at all, as long as its action is not for a discriminatory reason.'" *Id.* (quoting *Nix v. WLCY Radio/Rahall Comms*., 738 F.2d 1181, 1187 (11th Cir. 1984) (abrogated on other grounds by *Lewis v. City of Union City, Georgia*, 918 F.3d 1213 (11th Cir. 2019) (citations omitted)).

Conwell received the January 23 Communication and the January 31 Final Warning for failing to use the proper call-in procedure on January 31, 2017. The Final Warning warned Conwell that "[a]ny violation of the Work Rules during the twelve (12) months from the date this is issued may result in discharge." (Doc. # 48-1, Ex. Z). Conwell then failed to call his supervisor when he missed his February 8 and 9 shifts. On February 10, 2017, Plastipak terminated Conwell's employment because he violated the call-in procedure after multiple warnings. (Doc. # 48-5 at 212-213; Doc. # 48-5, Ex. 27; Doc. # 48-1 ¶47).

Courts have consistently held that an employee violation of a work rule (or work policy) is a legitimate, non-retaliatory reason for an adverse action. *See Burdine*, 450 U.S. at 256; *see also Douglas v. DeKalb County, GA*, 308 F.App'x. 396, 400 (11th Cir. 2009); *Brillinger v. City of Lake Worth*, 317 F.App'x. 871, 877 (11th Cir. 2008). Plastipak has articulated that this was the reason

Conwell was terminated, so the burden shifts back to Conwell to show that Plastipak's reason was pretext for retaliation.

### 3.    Pretext

A "[p]laintiff may demonstrate that [a defendant's] reasons were pretextual by revealing 'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [defendant's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.'" *Springer v. Convergys Customer Mgmt. Grp. Inc*., 509 F.3d 1344, 1348-49 (11th Cir. 2007) (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004), *cert. denied*, 546 U.S. 960 (2005)). However, a reason is not a pretext for retaliation "unless it is shown *both* that the reason was false, *and* that [retaliation] was the real reason." *Springer*, 509 F.3d at 1348 (quoting *Brooks v. County Comm'n of Jefferson County*, 446 F.3d 1160, 1163 (11th Cir. 2006) (emphasis in original)); *see St. Mary's Honor Ctr.*, 509 U.S. at 515.

A plaintiff "is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer." *Chapman v. AI Transp*., 229 F.3d 1012, 1030 (11th Cir. 2000). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Id*.; *see also Alvarez v. Royal Atl. Developers, Inc*., 610 F.3d 1253, 1265-66 (11th Cir. 2010). "'The heart of the pretext inquiry is not whether the employee agrees with the reasons that the employer gives for the discharge, but whether the employer really was motivated by those reasons.'" *Lee v. Addiction & Mental Health Servs., LLC*, 2020 WL 4284050, at *8 (N.D. Ala. July 27, 2020) (quoting *Standard v. A.B.E.L. Serv., Inc*., 161 F.3d 1318, 1333 (11th Cir. 1998)).

In her affidavit, Melton explains the decision to terminate Conwell's employment as follows:

> I made the decision to terminate Conwell's employment for continued failures to call-in when absent. Conwell had received prior written warnings that he must call-in to his supervisor when absent from an expected shift on earlier occasions. He then received additional verbal warnings from Wallace on two or more occasions. On February 10, I met with Conwell at Plastipak. Shelly Wallace was also present. I terminated him for violating call in procedures.

(Doc. # 48-1 at ¶47). The Communication documenting the termination of Conwell's employment states:

> Reason for communication: Not following the proper call-in procedure when not reporting to work for your scheduled shift on February 8, 2017 and February 9, 2017.
>
> …
>
> Action taken: You were placed on Final Warning on January 31, 2017 for not following the proper call-in procedure when not reporting to work. As a result of your continued disregard for following the proper call-in procedure when not reporting to work on February 8th and 9th, your employment is terminated.

(Doc. # 40-2 at 193). The communications Conwell received in January 2017 indicated that Conwell did not follow call-in procedures. (Doc. # 48-1 Exs. U, V, W and Z). None of them describe precisely how he did not follow the call-in procedure. And none of them indicated in writing that he was required to call his supervisor directly. (*Id.*). To be sure, Plastipak's written policies expressly allow an employee to call the Talent Management department *or* the supervisor.

The only times Melton or Wallace documented in writing that they told Conwell to call his shift lead, and that notifying Talent Management of an absence was insufficient, were (1) in Conwell's LOA Log on February 9, 2017 (the day before his termination), and (2) in the Termination Communication he received when he was informed of his termination. (Doc. # 40-5 at 105). Conwell testified that he thought telling Wallace (in Talent Management) was sufficient, and does not recall her telling him he also needed to call his supervisor directly. (Conwell Dep. at

208-17). Moreover, despite the fact that Wallace had spoken with Conwell on February 8 and knew he would not attend his shift, she instructed his supervisors to "[j]ust mark no call no show." (*Id.*).

As Conwell points out, pursuant to Plastipak's written Call-In Policy, an employee may call any manager of the warehouse or the Talent Management department if they are going to miss work or be late for their scheduled shift. (Doc. # 48-5 at 85-88; Doc. # 48-5, Ex. 4). Additionally, Plastipak's Attendance and Tardiness Acknowledgement, which Conwell signed, states, "Associates must call the shift lead, department manager, or Talent Management/Human Resources as soon as possible but definitely no later than the Associate's shift's starting time if the associate finds that he/she cannot make it to work one day or is going to be late." (Doc. 48-2, Ex. 3, p. 1). Conwell's supervisor, Foy, testified that the call-in procedure as he understood it was consistent with the written policy. (Doc. # 48-6 at 19-21). Conwell testified that he understood that, "once you talked to management with Plastipak that it went all over the warehouse." (Conwell Dep. 61:10-11). Conwell also testified that, on September 30, 2016, he called Wallace to report that he *would* work his shift that night, and Wallace notified his shift leader and manager. (Doc. # 48-2 at 76, Ex. 10, p. 4).

Conwell asserts that he was permitted to call in to the Talent Management department until January 2017 and that he was never written up for failure to follow the call-in procedure before he was FMLA eligible in 2016. It does appear from the Rule 56 record that Conwell contacted his supervisor directly when he would not be in, either by telephone or text, other than on the dates for which he was disciplined for not following the call-in procedure in January 2017. (Doc. # 48-1 Exhibits, generally).

The problem here comes down to the fact Plastipak terminated Conwell's employment for something that Plastipak's written policies specifically allow – notifying Talent Management of an absence. Even if Conwell was verbally instructed to call his supervisor – and there is a dispute of fact about that – such a verbal instruction was contrary to Plastipak's own written policies. There is also evidence that on one occasion Conwell notified the Talent Management department that he would be at work, and they relayed the message to his supervisor. Further, on one of the days in question (February 8, 2017), Wallace (in Talent Management) advised Conwell's supervisor to mark him no call/no show even though he called her to say he would not be at work. The Rule 56 record does not indicate that Wallace contemporaneously documented an instruction that Conwell should call his supervisor.  And, the next day (February 9) Conwell again spoke to Wallace and told her he would not be at work for his night shift. Wallace claims she told Conwell to call his supervisor,[5] but that is disputed.

The current Rule 56 record, therefore, reveals questions about Plastipak's proffered legitimate reasons for Conwell's termination that require the factfinder (not the court) to resolve. *See Springer*, 509 F.3d at 1348-49. Because the court concludes that there is a genuine issue of material fact to be resolved by a jury as to whether Plastipak's articulated reason for Conwell's termination were pretextual, Plastipak's Motion for Summary Judgment on Conwell's FMLA retaliation claim is due to be denied.

## IV.     Conclusion

For all the reasons discussed above, Defendant's Motion for Summary Judgment (Doc. # 47) is due to be granted in part and denied in part. A separate order will be entered.

---

[5] Wallace also testified that employees on FMLA leave could contact Talent Management about absences, but others who were going to be absent or late were required to call their supervisor to give notice. (Doc. 48-7 at 43). This distinction is not found in the company's Attendance and Tardiness Policy. (Doc. 48-2, Ex. 5).

**DONE** and **ORDERED** this February 8, 2021.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE